First case today is 14-2247, Carlos Hernandez-Cuevas v. William Taylor, et al. Is there a garbage thing over there? Miss? Not now, but at some point we need a garbage disposal plan here. Pedro Vasquez, good morning. Good morning, Your Honors. Good morning, sister councils from the government. My name is Pedro Vasquez, for the record, on behalf of plaintiff appellant Carlos Hernandez. As is abundantly clear, we're on our second trip to this court with this case, pursuant to a dismissal under Rule 50 after the plaintiff presented its case in chief in trial. The magistrate judge issued its ruling under Rule 50, basically using what we understand that was an incorrect standard, injecting malice into the equation, where this court had previously, in the prior visit here, had made a pretty clear distinction on common law malice and constitutional malicious prosecution, basically explaining in there that you don't necessarily, you can fail on the common law elements and still meet the objective reasonableness of reckless disregard standard. And by her articulation in the opinion and order, where she injected malice, we believe that an error was made. We do believe that the case should have proceeded for jury deliberation and the ultimate determination. There's a couple of factual points that I also think that need to be addressed to this court. Counsel, excuse me. The allegations that seem to be at the heart of the complaint that we were reviewing the first time around was the allegation that the officers involved had really concocted a photographic array that led the confidential informant to identify your client as the individual with whom he had been dealing during the money laundering transaction. That was just an allegation, and we concluded that that allegation, among others, was enough to allow the complaint to survive. But then you get to trial, and you have to present evidence that they were involved in some shenanigans, if you will, with that photographic array. It turns out there was no such evidence. I mean, the evidence at trial, as recounted by the magistrate judge, was that they got a photograph of Mr. Hernandez, submitted it, I believe, to the FBI, not locally, but I guess in Washington, and they put together what would appear in a perfectly appropriate manner the photographic array, and that's what went to the confidential informant who then identified Mr. Hernandez as the person with whom he had been dealing. So that allegation was not at all supported by the evidence at trial. That seemed to be what was at the heart of the magistrate judge's determination. So what was wrong with that determination? I think, Your Honor, with all due respect, that's only part of the equation, and I think that the rest of the equation has to do with how that photograph was obtained, and the way in which the information was obtained from the confidential informant. You had on July 20, 2004, the narcotics, excuse me, the money laundering operation. Ten days, actually, it's almost three weeks later that the FBI agents obtained the actual physical description. It's August 10 that they obtained the actual physical description of the person that's dropped off at 1655 Santa Ana Street, where my client happened to, by fortuitous circumstances, reside. And when something that is critical here is Special Agent Stephen Martz, when he testified, in my notes during the surveillance, there is no physical description of him. There is a partial description, but the weight wasn't there, and the height wasn't there. It's three weeks later, in a process that might last 10 to 20 minutes, where the confidential informant, has actual visual contact with this person. And if you look at the totality of what happened here, you've got eight surveillance agents from a task force saying, there's three guys. The confidential informant says, no, there's two guys. And the physical description of both people, my client versus the guy that's identified as unsub number three, that's dropped off at the same address, is remarkably dissimilar. I think that should not be lost on the court. I thought, in fact, the confidential informant, there's evidence in the record that the description of the individual with whom the confidential informant was dealing was actually pretty close to the description of Mr. Hernandez. Now, somehow, that gets translated into a different description, which does differ from the physical attributes of Mr. Hernandez. But isn't there an initial description by the C.I. that is pretty close to Mr. Hernandez? Well, Judge, three weeks later, okay, and the confidential informant provides it, Judge Lopez, and when you look at Agent Martz's handwritten notes of the surveillance officer, he admits, and actually in the notes, for that individual, unsub number three, there's no weight and there's no height in there. Okay, so I do believe that there, and if I may, I would refer the court to the joint appendix, page 294, 295, and 297, which that's the trial transcript. I'm sorry, but Counselor, I'm still trying to figure out what are we supposed to, assuming that there was no weight or height, what, the inference you want us to draw is what about these two agents? That there was a reckless indifference to what was obvious here when you even have Stephen Taylor, excuse me, William Taylor testifying, look, I understand that there's a discrepancy in the physical description provided by the surveillance team and the one given to us by the confidential informant. There should have been some form of corroboration. I think another critical factor here is that the confidential informant says the people that we were dealing with, the guy that we were dealing with here unsub number three was Puerto Rican. My client's Dominican. State it another way, Judge Thompson. I don't understand because Dominicans and Puerto Ricans, many of them look like everybody else. Let me say it another way. If the description that you get is of an American with the same accent of anybody in this room and all of a sudden you bring in with somebody that sounds like Tony Blair, the former British Prime Minister, you've got the wrong guy. And I think that should be patently obvious. There's a marked inconsistency here with the description that you're getting. Are you asking us to draw some inference from the fact of the three-week delay alone? Well, yeah. And part of the inference is that there should have been further corroboration here. You've got a group of surveillance agents with a surveillance report that's giving you a very, very different physical description from the one that the confidential informant provided. My client was tall, thin, about 40. The description that the surveillance team was providing for the guy that gets dropped off at the same address is somebody that's close to 60, heavy set, and short. Now, clarify for me again. The description of the confidential informant is actually very close to Mr. Hernandez in terms of age. And physical attributes. When was that description from the CI given to the agents? How close in time to the events that we're talking about here? August 10. July 20, 2004, and that full description then was provided August 10. So several weeks later. Yes. And what's wrong with that? Well, I think that it casts a real serious doubt on the veracity under the totality of the circumstances of the information that these FBI agents had in order to proceed to identify this person for a photo array lineup. Are you saying that the CI made up the information that he provided to Martz? Possibly. But is there evidence of that? We don't know. The CI was never produced. That's the information that William Taylor and Stephen Martz testified that was given to them. But the CI was never materialized. But it is similar. Excuse me? This is very tragic for your client. I don't think any of us doubt that. But the information that the CI allegedly gave is a description that is similar to your client's description. Well, yes and no. I think that there's a major problem here when it occurs three weeks later and when you look at the totality of what they also have in front of them with a surveillance report and they both testified, well, we think it's also accurate. And we have no reason to doubt the veracity or the quality of the surveillance report. I mean, their own statements are also casting doubt on what they're doing. I guess I'm trying to figure out how this goes from something that might be negligent police misconduct to something that demonstrates malice. Well, once again, Judge, my understanding from your prior ruling is that malice doesn't necessarily belong into the equation. But then looking at this from their subjective standpoint, okay, if you've got so many inconsistencies, so many things that don't check off in favor of Carlos Hernandez Cuevas being the person involved in the July 20, 2004 transaction, they couldn't connect him with the cars, with the phone numbers. He has no connection here. He just happened to live in the wrong place. And everything, the only way that they connect him there is by doing a spot check six months later, looking at the address and looking at the cars that are consistently being parked there. And there's only one thing that would connect Carlos Hernandez to that address where unsub three was dropped off, a gray infinity. When we asked the FBI agents, well, what connection did the gray infinity have to all these operations? Zero, none. You haven't mentioned any relevance of the finding by the magistrate that there was probable cause. Have you overlooked that or is it not relevant? Well, the magistrate judge took the position that they didn't create the photo array. Okay, well, I think you may have misunderstood my question. What about the fact that the magistrate found it was probable cause? I just think it's completely inconsistent with everything on the record. Well, but what does that do to your case? Well, if your determination would be that what the magistrate judge found is correct, it ends the case. Even if it wasn't correct, you're suing the agents. They presented the evidence to the magistrate, the magistrate found it was probable cause, and everything else follows from there. Oh, wait, wait, I'm sorry. I think I misunderstood you. You're talking about in the District of New Jersey? Yeah. Okay, well, I think that it was presented with false information. Yeah, on that issue of false information, counsel, I mean, you criticized the magistrate judge for using the wrong standard. I mean, actually, for introducing the notion of malice into the analysis. I mean, the judge basically quoted the language from our earlier decision, and I think the point we made there was that to the extent that there was proof that officers intentionally or with reckless disregard for the truth concocted information that was false, that's really very, that's tantamount really to common law malice. I mean, we said there really, when you take a close look at what's going on here, there really isn't much difference between common law malice and the showing that has to be made to convince a court that it should disregard certain information that found its way into an affidavit that supports a probable cause determination. So I don't see any legal error in the district court's analysis in light of our decision in the earlier case. Well, I do believe that we would have also met a common law malice standard with what we presented, you know, and I think that, I'm not trying to split hairs here, but on that line, what this court also ruled is that you may fail the elements of common law malicious prosecution but still meet the malicious prosecution under pure Fourth Amendment standard. And I think we did establish that threshold. Does the court have any additional comments or questions? May I be seated? Thank you. Ms. Taylor, good morning. Good morning, Your Honors. May it please the Court. Leah Taylor again on behalf of Appellees William Taylor and Stephen Martz. The plaintiff brought this Fourth Amendment malicious prosecution bid into action, alleging that FBI agents William Taylor and Stephen Martz conspired and knowingly or with reckless disregard for the truth, caused Mr. Hernandez's seizure and arrest without probable cause. The plaintiff presented just three witnesses at trial, himself and two defendant agents, and the parties also stipulated too many facts in this case. The stipulated facts, along with the uncontroversial evidence at trial, show that the informant had, one, a face-to-face, 25-minute interaction with the courier, two, that the plaintiff matched the informant's contemporaneous description of the courier and brother counsel mentioned that this description was provided three weeks later, but in fact this description was actually provided the day the transaction occurred. This description was also provided the next day the transaction occurred. The date of the report was three weeks later, but that's the transcription date. Counsel, why is it then that three weeks later it appears we do have a description of Mr. Hernandez that does differ significantly from the much more contemporaneous description given by the CI? How did that happen? Your Honor, respectfully, the description that was provided by the informant on the day of the transaction is remarkably similar to the description that was provided the next day. It was then transcribed and there's a report that's dated August 10, 2004. In Joint Appendix pages 461 to 465, there are the notes of Stephen Martz where he took down a contemporaneous description, same-day description of the courier and the courier was described as black, as fat, as Puerto Rican, as 39 to 41 years of age. The very next day when the informant was debriefed by Stephen Martz, he provided again a description of the courier as black, as fat with a big stomach, as Puerto Rican, 39 to 41 years of age. The only difference between that description the next day and the same-day description was that the height was added. The height that was given at the time, the day after the transaction, was 5'10". So the two descriptions are actually remarkably similar. The only difference is the added description of height, which is 5'10". On page 12 of my brief, I provided a chart to the court which outlines the description, the contemporaneous description of the courier and the description that was provided to the FBI identifying the physical characteristics of Plaintiff Hernandez. The courier was described as male, 39 to 41 years of age. His height was 5'10". His complexion, dark. His racial appearance, black. His weights were billed, fat with a big stomach. Last known address, 1655 Santa Ana Calle. Hernandez, by his driver's license information that was provided to the FBI agents, he's male, he's 40 at the time of the transaction in 2004. His height is 5'11". His complexion is medium brown. His race is black. And his weight is listed on his driver's license information as 185 pounds. But there's also a picture that accompanies that driver's license information, a picture provided by the Department of Transportation, which Hernandez-Cuevas appears to have a very full face. I think the pictures are provided to the court on joint appendix on pages 472. And that picture depicts Mr. Hernandez with a full face. His weight appearance appears to be heavy. Again, last known address, 1655 Santa Ana Calle. In addition to the matching physical descriptions between the courier and plaintiff Hernandez, the informant, to confirm that they got the right suspect, both Taylor and Martz made sure that the informant, who initially provided this matching description, could identify, in fact, the suspect. What they did is they took a photograph that was provided by the Department of Transportation in Puerto Rico. They gave that photograph to a lab specialist in FBI NORC. And that lab specialist actually prepared the photo array using Hernandez-Cuevas' picture along with five other similar looking individuals. That photo array was emailed to the confidential informant. And the confidential informant said, pointing at the picture of Hernandez-Cuevas, said that is him, that is the courier. I'm very positive, I'm sure. I saw him twice. Because during the transaction, they had two encounters. And those two encounters lasted a total of 25 minutes. It was a face-to-face interaction. And the informant had a better opportunity to observe the physical characteristics, as opposed to the one surveilling agent who did provide a report and description of the courier. But that surveilling agent was at a distance of 50 meters away. The other courier, I believe the government positively identified that person, is that correct? Yes. It was never established that in fact he was a courier. The money laundering statute actually requires, has a knowing element, has an intent element, has a conspiracy element. The trial record facts establish that there were surveilling agents and the informant who observed an individual who is driving the first courier, who is now a passenger in the car in the second instance, in the second interaction. And that individual was seen taking a bag out of the trunk of his car and placing it into our informant's car. And that bag contained proceeds of narcotics trafficking. But it was never established that the driver who also placed the bag in the car knew that there was money in the bag that was proceeds of narcotics trafficking. What was established is that the informant's interaction with the first courier, who was a passenger in the vehicle, they had conversations about narcotics trafficking. It was clear from the wire, the body wire that our informant was wearing, the recorded conversations, that that individual was very well aware of what he was doing and he was complicit in a conspirator in this money laundering activity. I was trying to figure out if the police approached the driver who was a known entity. They did approach. They were able to obtain the information with respect to the driver of the vehicle. His name was Ruben Mejiaz. The trial record does not reflect that he was in fact arrested. There were no charges as far as the trial record was concerned that were brought against this individual. But was he questioned to find out the identity of the other person? I certainly understand that he has a Fifth Amendment right, but was he even approached to try to figure out if Mr. Hernandez was the person who was with him that day? The only approach that took place was the approach that same day. That was an approach to identify who the driver was and to record that information and to also do some further investigation as to who that individual was. But with respect to this investigation, this was a multiyear international money laundering investigation. Typically the FBI does not want to compromise its investigation by tipping off or making those who are involved in the money laundering activity aware that they have been identified. So it's only until they're ready to arrest and begin prosecutorial proceedings do they then approach the individual that they suspect has been involved in this activity. So the trial record reflects that yes, Mr. Mejiaz was stopped, his information was recorded, but beyond that the trial record does not reflect what happened. So how much time elapsed between the transactions that were observed and recorded allegedly involving Mr. Hernandez and the subsequent effort to get an identification of him by the confidential informant who I believe was in Columbia at that time, is that correct? Yes. How much time between the activities involving observations of the courier and Mr. Hernandez and the actual identification that then serves as the basis for the affidavits that then provide the proper cause determination, how much time elapsed? It was approximately seven months, Your Honor. The transaction took place on July 20, 2004. In early February Hernandez Cuevas was actually identified by other agents other than the defendants that are in fact being sued in this transaction. There were other agents that were working with each other. There was FBI NORC and FBI San Juan that they were working together. There was an FBI agent by the name of Madeline Albright in San Juan and an FBI agent by the name of Kevin Conklin in NORC that were communicating with each other in February of 2005 to identify who was a resident of 1655 Santa Ana Calle where the courier was last seen going into the porch of. But he didn't enter. Is that the record correct that he didn't enter the residence there? The record reflects that he was observed going into the porch area of 1655 Santa Ana Calle. The record does not reflect how the two-story house appears, but the two-story house has a gate and to enter into the porch area you have to go beyond the threshold of the gate. But the trial record does reflect that the courier was seen going into the porch area of a house, so there's a reasonable inference that the courier in fact was associated with that residential address. That took place. The spot checks and the utilities checks to identify Hernandez Cuevas took place, as I said, in February 2005. And what FBI San Juan did is they looked at the vehicles that were parked outside of the house to determine whether any of the vehicles were registered to people who were residents of that house. And in fact, Hernandez Cuevas, through his vehicle that was parked outside of the house, was found to be a resident. They then did utilities checks to find out who were the residents that lived at 1655 Santa Ana Calle. The only male resident that lived at that address that fit the description of the courier was Carlos Hernandez Cuevas. The driver's license information provided from the Department of Transportation revealed that in fact, in 2004, the same time period of the transaction, he lived at 1655 Santa Ana Calle. With respect to the reckless disregard standard that was articulated by the court, the district court, the court, as this court has recognized, adopted verbatim the First Circuit's opinion in Hernandez Cuevas with respect to what was required to establish that these agents recklessly disregarded the truth with respect to the information that was provided to the magistrate judge. When Mr. Hernandez produced his passport demonstrating that he was not in Puerto Rico at the time of this transaction, why isn't that reckless disregard? Well, Your Honor, with respect to the probable cause analysis and the information that was known and available to the agents at the time, the passport is not relevant. The passport was actually obtained in 2007. That was three years after this transaction, three years after these agents were involved in collecting the probable cause facts that supported Mr. Hernandez's arrest. Mr. Hernandez had two passports. He had an expired passport that was in his residence and he had a current passport, which he actually had on his person and then presented to the magistrate judge who also determined that the passport, at least, the passport was not definitive as to whether or not he was in the Dominican Republic at the time of the events, which was July 20, 2004. But the agents simply were not aware of this passport. They simply were not aware of the fact that Mr. Hernandez was in or alleged to be in the Dominican Republic at the time of the transaction. So these agents can only act on what information is known for them as the court is well aware of probable causes determined by the totality of the circumstances, the information that's available to the agent, and that information was just not known. The agents, I gather, you've indicated, were called as part of the plaintiff's case at trial. Was there any exploration of why this case fell apart, why the charges were dismissed? Is there anything in the record? Because that arguably could shed some light on how they went about their work in preparing the affidavits to support the probable cause determination. Is there any explanation in the record of why this fell apart? Well, Your Honor, the standard for probable cause and the standard for proof beyond a reasonable doubt are clearly different. And there is evidence in the record, there are documents which show that plaintiff's attorney, his defense attorney at the time, did present his passport information to the AUSA who was assigned to this case at the time, Robert Frazier. And there's a note in the joint appendix which reflects the communications between the plaintiff's attorney and the AUSA indicating that he was in the Dominican Republic at the time of this crime. The assistant United States attorney made the decision not to go forward with the charges. It was not dismissed without prejudice right away. It was not dismissed right away. But once the AUSA received the passport information, spoke to Mr. Hernandez's defense attorney, he agreed to Mr. Hernandez's release on his own recognizance. At a later date, he decided to dismiss the case without prejudice.  Thank you.